This case is People v. Burton 410-0725 for the appellant is Mr. Costello, for the appellee is Ms. Brooks. Mr. Costello, you may proceed. And, by the way, counsel, we're early and I know we ask you to be here early, but I thank you for being here early and complying with our request so we can start a little early and be ready to go. Thank you, Your Honor. Please report, Ms. Brooks. This is a case where the defendant was convicted of leaving the scene of an accident resulting in the death of an individual. The scenario begins that at approximately 3.30, which is the only verification we have of time of death, the defendant was struck by an automobile, it appears. A witness, a white neighbor, was awakened by a loud impact. She looked at her clock. The body was discovered shortly thereafter. The defendant is a chap named Burton. The scenario is that a witness, Cathan, testified to his confession to her. This came about by this, the defendant and Cathan were drinking in a tavern in Decatur at or about 2 p.m. to the last call. They then drove, were going home, they then drove through Argenta and it's been verified by the police that it takes approximately 15 minutes to go from Decatur to Argenta from the tavern they were located at. They drive through Argenta and they have an argument. The defendant and the witness, Cathy, female, always had a contentious relationship. They start arguing, he throws her out of the car. This is one of his usual habits. She gets out. Then all of a sudden he turns around and goes back towards Argenta. The defendant was killed just outside Argenta. He then comes back looking for her, doesn't see her, she's hiding in a ditch. He drives back to Argenta and the prosecution theory is that that's where the defendant was killed. They reconciled again, but when he got back in the car and picked her up, he did drive back and picked her up, he told her that there was some chap sort of kneeling in the roadway. He struck him and he turned and the victim went to the left. Thereafter, she never reported this to the police until sometime in August, 15 months later, and said that the defendant had killed, confessed to it that the defendant had killed. We're arguing here that the confession of the defendant was not corroborated by other evidence, which it must be. And we're arguing that the defendant was not proven guilty beyond a reasonable doubt where no reasonable prior effect could have convicted the defendant. Because the essential elements of the crime were not found. You must have corroboration with the confession. What is the corroboration? The defendant and Catherine, the girlfriend, she was driving his vehicle sometime prior in about January or thereafter, or shortly before, and she went into a ditch. The defendant took his vehicle to a friend to repair it. Cosmetically, he did the front bumper and painted it with black paint and other paint. The underside and other damage was not repaired. After the defendant was arrested, he denied it when confronted by interrogation. The car was examined in September of 2009. And the person who examined the car, a mechanic retained by the police, determined that the retaining pins for the bumper were of GMAC. The vehicle of the defendant was GMAC. At the scene, a retaining pin was found for the front bumper, which was of GMAC. A forensic scientist, trace expert, looked at the comparison of the paint taken off the vehicle when it was examined by police insistence in September of 2009 and determined that the chips on the body of the defendant could have resulted from the bumper of the vehicle. The state made a great deal of hay on the fact that the defendant traded in this Monte Carlo with, shortly after the occurrence, I think seven days after the death, he traded in at this Decatur place where he always bought cars. And damage was found on this car of approximately $1,700, basically underneath. The defendant suggests that could is not proof. There can't be corroboration in part of the circumstantial evidence of whether or not he made up the story or she made up the story of the accident? Yes, Your Honor, or yes, Justice, it could be, but this is not, there are millions of cars that have, well, there are many cars that have black paint. The paint that the chap did in January of 2008 repairing this vehicle used generic paint, black paint, which is used by everybody. So all we have is that, yes, I have a watch and I'm guilty of a crime because a watch was found at the crime. It is significant to note that the testimony of the examiner of the vehicle never said that a retaining pin was missing from the bumper when he examined the car. All he said was there were retaining pins of GMAC and some after, some different, everybody uses where cars repair some other parts if they don't have GMAC parts. And we would suggest that if nothing is missing, that pin is not corroborative of the defendant striking the victim, Mr. Buckley. So we have could for the paint chips, could or might, and we have a pin that's there, yes, I think it's obvious that the defendant was struck by some car. Now it's important also that the defendant, the reason he was in the street, which doesn't give rise to any defense. You keep saying the defendant, I think you mean the victim. The victim, yes, sir, yes, Justice, thank you. He was found standing in the roadway by a deputy sheriff who had gone to look for another vehicle that was selling dope at or about that time. And the victim was standing in the roadway saying God told him, or some words to that effect, was standing in the street. Now the pathologist gave her opinion that, one of her opinions as to how he was struck, that if he was struck, he was struck, he flew over the car. And that's contrary to what Burton allegedly told Caffin. He said he was nearing, and when he struck him, according to Caffin, he flew to the left. So it was a different person he struck? No, same person. But that's what you're arguing to us, that therefore, what? I'm arguing to you, Your Honor, that the statement of the confession to Caffin is a tissue of lies. And you can't consider credibility in determining under the theory. We're not just asking credibility of one witness. We're asking credibility in the totality that it's so improbable, especially 22 months, or strike that, 15 months later, that she finally brings to the attention of law enforcement that he is the person that struck the defendant. Mr. Costello, the jury apparently believed her. They heard all the evidence in the case. Yes, the jury apparently believed him. But you can't consider that her testimony is not credible. Yes, the jury believed him. He was convicted. He was convicted on a pin that was found at the scene, which could or might have, no one ever said it could have come from his car. It was just that his car had pins of GM, and they found a pin of GM. And the paint chips. And the paint chips could have occurred. It's disputed by the pathologist, although it was just one of her opinions. She was speculating as to how the accident, I have to be fair, how the accident happened. But then she made some phone calls to him, too, that were overheard by Bernice Fisher and the deputy. Yes, and the defendant gave the explanation that they were arguing about the insurance fraud. She claimed he committed insurance fraud by getting payment from the insurance company for the accident that was some months in January of 2008. That's what he claimed. She did say, Justice, that she screamed. She testified she screamed, and her girlfriend who was with her, she had been drinking at a tavern that night, and the defendant threw her out of the car again. She called her girlfriend. I think they had a couple more drinks, and then she confessed to another county's sheriff. But she screamed at him on the telephone, verified by the witness, you killed him. And that was never put in any report by the deputy sheriff of Pike County where she had gone to confess. But the witness testified. She heard that, right? Yes. The witness was a girlfriend that had been drinking along with… So she wasn't believable either? Well, he didn't respond to it. That's what all the caffeiners say is, you killed him. She's saying the same story. I thought he was on the speakerphone at one point, and he said something along the lines like, well, I'm just going to blame you. I'm going to say you did it. He was referring to her. She was actually driving the vehicle. He didn't testify at trial. No, he did not, Justice. So how do we know what he was referring to, counsel? Well, we don't. Then why are you telling us that's what he was referring to if he didn't testify? That's my take on it, Your Honor. But we're asking why, why, why? This is not a case with hard evidence of corroboration. All we've got is the jury convicted. They believed, but the jury convicted on a retaining pin found at the scene a theory that he flew over the car, which was impossible. No one knows how he was hit or what position he was in, and chips on his car that there are many, many black, not just the vehicle itself. It was a special vehicle. It was an intimidator. That's not very common. But this paint was used all over. And all the other tests that the forensic examiner did pertaining to the trace evidence really was inconclusive. So could or might have come from the paint chips. On this he is convicted. And the conviction has stemmed in large part on the confession made to him by Kathy. And we suggest that the evidence was not, that there was not any corroborating evidence to sustain it. That's sufficient for a reasonable man could convict on that evidence. Retaining pin for the bumper, which is used in thousands of cars from GM, and a could or might with the chips from the black paint on the car. Now you might say, well, is it a coincidence that there was black, but there were a lot of black painted cars. He's just an unlucky guy. Yes, your honor, he was. The circumstances. By the way, the car that the deputy sheriff was looking for previously, while the victim was standing in the street, was a black Camaro. Allegedly they got a call in that this black Camaro at this time of the morning was selling dope in Argentina. And the sheriff was dispatched to look for this car. That was a black car. What time was that call made? It was made, I think he got there sometime shortly after three, I believe, and could not find any black Camaro. But I thought the call about the black Camaro came earlier. Yes, it did. And that's when he saw the victim standing in the road. In the road. What time was that is what I was asking. Shortly after three, your honor. Three in the morning? Yes. And a semi-truck, while the deputy sheriff was there before the death, had come down the road and had swerved, didn't hit him. I thought the evidence at trial established that the accident occurred around 2.30 in the morning. The accident occurred at 2.30, that's correct. And one final point. Made a timeline. There's a timeline on this. They waited to drink to the last call indicator. And the last call indicator was at 2 o'clock. They stayed until then. Reasonably, it would take you maybe ten minutes to get to your car and get out of there. 2.10, drive to Argenta, 15 minutes, then drive through Argentina, throw her out of the car, come back, looking for her. She's hiding in a ditch. I gave that three minutes, driving back. And then drive back to Argentina where the impact occurred and Mr. Buckley was killed. It would be impossible on a timeline for that to occur. How about if it didn't take them ten minutes to get out of the bar? That's true. Closing hour, they walk out at 2. They could have rushed to the car. I'm just saying what I'm trying to present to the court. Would the timeline then work? No, it would not. If they rushed, and he rushed to the hiring. If they were in the car at 2 o'clock, it wouldn't work? He could have been there. But that's could. And I don't think we can convict a man for killing someone on could. The defendant has also raised a sentence of excessiveness. It was within the range of a Class I felony, eight years. And he didn't raise this in the post-trial motion. We put it in as a plain error to raise the excessive sentence. What was the plain error? That they didn't raise the excessive sentence in any motion. You weren't trial counsel? No, I was not. Thank you. I think that establishes whether the defendant is arguing the evidence simply is not prerogative of, which it must be with the purported confession of one retaining pin and similar paint chips. And of course, we're arguing a timeline, which is speculation, but which we suggest is reasonable. And that the court should not consider the confession of Caffey as a tissue of lies, that there is no corroboration for it, and that the conviction should be reversed. If the court has any further questions. Well, I just want to make sure my understanding is correct. He received eight years on a Class I conviction? That was 4 to 15? Yes. Do you agree that he had five Class A misdemeanor convictions and three prior felony convictions? When I wrote the brief, I did not have that information. The pre-sentence report was filed as a supplemental part of the record after my brief was written, yes. But I cannot contest it. And he was convicted of DUI and a high-speed chase after the incident, in this case, of which he was convicted? That is not confessed, Your Honor. And it's still plain error to give him less than 50% of the range of the Class I standard? That's our suggestion. Okay. Thank you, Counsel. You'll give a chance to address this again in rebuttal. Ms. Brooks? May it please the Court and the Counsel. My name is Anastasia Brooks, and I represent the people in this case. With respect to sufficiency of the evidence, the standard is highly deferential to the jury's finding of guilt, beyond a reasonable doubt. And the defendant would have to persuade that no reasonable prior effect could have believed Sherry Kaffen, along with all the other corroborating evidence, as being sufficient proof beyond a reasonable doubt. With respect to the suggestion that Kaffen was lying, there is no indication as to why Kaffen would lie, except for the fact, perhaps, that they were going through some sort of fights occasionally. And at the time in which she reported it to the police, making essentially what the defendant claims to be a false police report. What did the record show as to the relationship between her and the defendant? I'm not sure exactly what the extent of their troubles are, but they did have fights, and at the times when they would have fights on the road, that she would be kicked out of the car. And that's what happened on the night when she reported it to Hyatt County, which is not where this happened, but it was one of her friends, I believe, was a police officer. So that she went and talked to the police officer and reported it. And of course, the fact that she waited so long is not going to compel a finding that she is lying, because if she's just going to totally make this up, if she thought, well, 15 months ago somebody was killed in Argenna, and maybe the defendant was driving through Argenna, would that be a good thing to blame him for? Except for the fact that the other facts completely fit this. So the suggestion that she was lying is not going to be required to be accepted as an inference. Did she explain at trial why she waited? I'm not sure if she specifically explained it. The fact is that they did have an ongoing relationship. This is a very serious crime. If they did have an ongoing relationship, it could be reasonable to infer she would not want to disrupt that by alleging a Class I felony against him that was sent into prison. So what finally happened at the 15-month mark to make her come forward? Well, they had another fight. She was kicked out of the car. She calls her friend. She gets picked up. And then she goes to Piatt County and talks to her friend, the police officer, and makes this allegation. Of course, the additional corroboration to the fact that what would an innocent person say to the potential allegation? I'm going to the police and I'm going to explain that you had killed somebody in Argenna. A jury could infer, well, an innocent person isn't going to say, well, I'll tell them that you did it. They're going to say, what person, what Argenna, you know, 15 months ago, I don't understand, except it's I'm going to blame you, Sherry Kaffen, for this. And that seems to be something the jury can infer. Did the police hear that remark? I don't think the record is clear on that point. There was two different conversations, and one is overheard by the police officer and the other is overheard by her friend, Bernice Fisher. Still, if Kaffen's lying, then you also have to consider, although it's Kaffen's friend, she's an additional witness who doesn't have the same defects. So it was her friend who heard that line? Her friend had overheard that line, I believe, is what the record had showed. I may be incorrect on that. It's been a while since I've briefed this. I do not think the police officer overheard that particular remark, although there was another call inside the police station. But essentially the question can become also whether, even if Kaffen's testimony of this confession was totally set aside, would there still even be sufficient circumstantial evidence to convict based on the circumstances defending trading off this highly desirable car with undisclosed front end damage within days of the collision? And it might have been like six days or something by the time it was actually traded. Of course, the defendant might claim, well, I was looking at cars for the last several months. If you were, that's not an inference that the jury has to accept as inconsistent with guilt, because this Intimidator car is a limited edition. I'm not a racing fan, but apparently Dale Earnhardt was a beloved race car driver who died tragically, and this was a desirable car to have. So it's not something that one would, if it's a prized possession, would be traded off lightly. The fact that it happened within days, and it also has the damage. Now, the damage is not immediately perceived by the dealership. Of course, the dealership is going to take a loss on this, because they should have deducted the cost they were going to pay out for this car if it had observable damage. However, the possibility the defense wants to make, well, maybe it got damaged on the lot after he traded it off. Well, again, the jury doesn't have to accept that as an explanation, or infer that fact as that mere possibility of damage, as the cause of this damage. Now, of course, many General Motors cars, this happens to be a retaining pin. So it's not a strong piece of circumstantial evidence, but again, it adds to the case, it fits.  Of course, once this car is traded in, it's repaired, it's repainted, it's sold to a new owner, and 15 months goes by until Sherry Catherine reports it to the police. Wouldn't there be some record, though, by the dealer, if the retaining pin were missing in the car when they got it in and they had to repair it? I don't remember exactly what the records show. Was there any discussion? You heard Mr. Castello saying, hey, there's no indication that this is missing. What about that? Well, there's no proof that a dealership employee or whoever they sent it to to repair it had noticed a missing retaining pin and replaced them. I'm not sure if that fact might have been proven. It doesn't necessarily mean that there were, in fact, no retaining pins missing. The defendant isn't presenting proof contemporaneous with this initial repair after he trades it off to show that there were, in fact, no missing retaining pins. Well, what was the evidence in this point? That the car was damaged as the dealership noticed after they got it or traded it in and they had to fix it? What was the evidence on that? Right. The person who does an initial appraisal, sort of like walks around the car and looks at it, it's going to come out of their pay, so they don't want to miss anything. But then it's going to be a more detailed inspection. They're going to want to make sure. They want to sell good cars, so they want to make sure that the car is in good condition so they do a more thorough inspection. And at that point, they discover the damage is repaired. But my point is that essentially there's no need for a forensic examination at that point because there's no allegation that this car at that point had been involved. So when it's being repaired, the dealership's not necessarily going to keep track of very cheap parts, for example, these retaining pins, whether any have to be added back to the vehicle. So if I understand your position, the dealership repaired damage to the car and that whether a pin was replaced as part of the repair of the damage, there was no record of, and no one would have been expected to keep a record of it because there was no indication that this was some sort of forensic inquiry? Right. This would be a more of a routine repair at that point, and I'm not sure that the record would show that there was, in fact, no missing retaining pins when they went over this vehicle. It's not like it was an in-depth forensic examination of the vehicle at that time. So all the record shows is there was damage that was repaired? And repainted. And it repainted is a very key fact as well because it was the underlying clear coat over black layer that had the consistent matching. And, of course, this is not going to be to the exclusion of every other car in the universe because, as the defense points out, this was, in fact, could be a commonly used black paint. Of course, the forensic examination, though, however, looked at every possible available test for physical and chemical properties and found no significant difference amongst these. And so the fact is that once the dealership repaints it after repairing the damage, it's not the outermost layer that matches, it's the underlying layer that matches, the one that would have been repainted after the 2007 accident that Sherry Caffin had with this car, which was repaired. So it's not a situation where the jury has to infer that there had been no additional damage caused to the vehicle because Caffin's accident was repaired. So, therefore, when there is damage when it arrives at the dealership, that's additional damage and there had to have been some cause for that. What about the argument you heard Mr. Costello make that the injuries in the deceased found by the pathologist were inconsistent with Caffin's report about how the defendant allegedly told her he hit somebody? Again, the state's claim is that these facts do not compel a finding that Caffin was lying or that the jury had to disbelieve her because it is possible that what the defendant did was he lied in order to minimize his own culpability. He lied when describing the incident, at least in part, to Caffin, who then truthfully reports to the police what the defendant told him. So it's not necessarily a situation where the jury has to conclude that Caffin made up... He told her that someone was kneeling in the street that he hit? Do I have that correct? I'm not sure exactly what the indication was, but regardless of what she said about how the accident actually happened, there is not a lot of information to understand exactly the mechanism of this other than just what the forensic pathologist had inferred from the nature of the injuries.  The victim, Buckley, is dead, and the person who is the neighbor who only heard a sound of an impact. So therefore, the only person who would have known exactly how this happened, except inferentially from the nature of the injuries, is the defendant himself. And what he told Sherry Caffin may or may not have been completely true. What Sherry Caffin then tells the police officer about what the defendant told her could be truthful if the defendant were in fact lying, at least in part, to Sherry Caffin about what happened. So therefore, it's not a situation where that means that Sherry Caffin has to be disbelieved. So although the presence of the pen, the matching of the paint, none of these has to be proof beyond a reasonable doubt in and of themselves. But when combined together, the fact that he traded off the car with damage very close in time to the accident, they all serve to support her testimony. So therefore, it was a situation where it was eminently reasonable for the jury to believe her, despite the delay in reporting, despite the fact that she may have other problems of credibility  that's still a situation. Oh, the timeline as well, it's not inconsistent with what the timing of the crash, the approximate time that it was heard by a neighbor in the area. If they had left the cater, given the drive times, it is within the range of possibility  So therefore, for those reasons, evidence was actually very, very strong. It's not a situation where it's so weak as to leave a reasonable doubt or to require this court to review. Where was the tavern they were drinking in Decatur before the accident? I don't know, or I remember, or maybe even the record does not say that. I know Decatur is a fairly large city, so it could affect it. But if we're talking about a matter of minutes. Did she indicate the tavern by name, do you recall? I don't recall exactly. But even if it were a situation where the timeline seems to miss by a couple minutes, there's always a possibility that the barkeeper decided to close early, called last call, his watch was running fast or something, or just wanted to get home sooner or something. The facts are not such that the defendant is proving that he couldn't have possibly done this, given the strong weight of corroboration on top of Katherine's account of his confession. Well, Mr. Costello emphasized the timeline. Was there any testimony specifically offered by a police officer or anybody else as to how long it would have taken from point X to Y, that is, the tavern to Argenta? If I understood him correctly, he said 15 minutes. I'm wondering was that actually testimony in the record or was that his speculation? I don't remember exactly if that was testified to. I thought that was, but I'm not completely confident that that was the case. Okay, well, I'm not sure it's that important, but I wanted to, if you knew off the top of your head. I thought there was some indication in the testimony, but I may be incorrect on that. But essentially that could be something that might be able to take judicial notice of, given the distances between the towns. Well, this was a jury trial, wasn't it? Well, I'm just wondering if this would be common knowledge among jurors anyway in Decatur that they would know where Jant was in relationship to locations in Decatur. Right, I'm not sure. If they left at 2 o'clock and the collision happened around 2.30, it seems to be within the possibility. It's not something that's going to exonerate him, in other words. As far as sentencing, very brief remarks. This offense on January 1st had just been elevated to a Class I, the January 1st prior to this incident. So it was a situation where it became a 415. He does have the very significant prior history in the prior Class I act that aggravated fleeing and eluding five misdemeanors, including driving offenses, such as reckless driving and two DUIs, according to the PSI. There's also evidence that Caffin had testified that the defendant was intoxicated. And so it's a situation where we can't prove the DUI because he doesn't report the incident and we don't find out about it until 15 months later. So there's no way we can go back and prove that this was, in fact, an aggravated DUI situation. However, at least the testimony is aggravating in the sense that if he were, in fact, intoxicated at the time this accident happens. It shows the strong need to deter the sort of situation where, like here, if somebody is driving intoxicated, hits and kills somebody, they're not going to be allowed to evade responsibility by simply allowing this crime to go unreported and then the proof of their intoxication disappears. So in that situation, there is a strong need to penalize this conduct, even if the fact is that if Buckley had been immediately hit and killed, because of the nature of the injury, it's not like because he left the scene and didn't report it, Buckley then died and would have lived otherwise. That's not the situation, although that could be the case in other situations. But still, the fact that this crime needs to be deterred to prevent DUI offenders in particular from evading responsibility. So for that reason, this sentence was not abuse of discretion. I'd like to entertain any questions you have. I thank you and request this Court to affirm. Thank you, Counsel. Mr. Costello, any rebuttals, sir? In response to a question I asked of the defendant's relationship with the defendant, it wasn't good. She had made numerous police reports. She had done what? And at least two orders of protection, the record reflects, she had asked for. As to the Court's comment, a question on timeline, Deputy James Herman, a sheriff's sergeant, testified the timeline from the tavern, from Decatur to Argenta. And I believe, and the record reflects, 15 minutes he testified. What was the tavern? I believe the record reflects it was a place called Bootlegger's, Your Honor. Was that in the north part of Decatur, do you recall? It was closer to the genocide. As to your question, Justice Simon, as to the lack of documentation of a missing pin, all that was done on the repair, which was, according to the defendant, repair from the previous accident committed by Caffey in January of 2008 before the death, was an estimate of $1,700. No pin, it's in the record as an exhibit, no pin was noted on, missing pin was noted on the estimate. It's sort of a generic. They said $1,700 for repair work? Yes, it does. Finally, to state what the Caffey precisely said to, what the defendant precisely said to Caffey. This is her testimony on record. She testified under oath that 15 minutes later he came back and she was standing on the road. He told her to get into the car. He told her that he had hit someone in Argenta. He said he went back into town where he thought she had gone. He was looking to the left and to the right and when he looked up, there was a guy kind of knelt halfway down in the road and he hit him. When he hit him, he said the guy flew off to the right. He said he got out and asked him if he was all right. The guy said, get away from me, leave me alone. Burton got back into the car and drove off.  The point is, he tells Caffey, according to Caffey, that the guy talked to him. The pathologist says, death, he would have lost consciousness in three seconds. Does that mean Caffey's lying or he lied to her? I think I would argue, Your Honor, that Caffey's lying. Why should we conclude that or why would the jury be compelled to conclude that? Because it makes him look better. Yes, I think that why would Caffey lie? There's human experience, I can't tell you. Just that they had a contentious relationship and this was payback. One further point, and then I'll sit down. The appellate counsel, Ms. Brooks said, take out the confession and there's sufficient corroborating evidence. I would suggest that no prosecutor would file on a case without a confession or some other compelling corroborative evidence on a generic pin on the road and on paint chips or on black paint and paint chips, which could have resolved from any other automobile. But it turns or falls on Caffey, I guess. Let's say I agree with you that it turns or falls on Caffey. The jury was aware of this contentious relationship between her and the defendant. Yes, Justice. So they heard all that evidence and I assume that the defense argued she was not believable and that she had an axe to grind and the jury evaluated her after seeing her testify in the courtroom.  I think that her testimony is improbable because it's a conflict with the pathologist. It's a conflict with the victim, Mr. Buckley, even being able to speak after being clocked allegedly by the defendant. It just doesn't add up. As Justice Steinman said, he was in the wrong place at the wrong time. If there are any other further questions... Thank you, Counsel. We'll take this matter and advise it to be in recess for a few moments.